

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-18-00252-CV

_____

## IN THE INTEREST OF R.A., R.G., AND J.G., CHILDREN

---

On Appeal from the 323rd District Court
Tarrant County, Texas
Trial Court No. 323-104611-17

---

Before Kerr, Pittman, and Birdwell, JJ.
Memorandum Opinion by Justice Kerr

# MEMORANDUM OPINION

Mother and Father appeal the trial court's judgment terminating their parental rights.[1] *See* Tex. Fam. Code Ann. § 161.001(b)(1), (2). We affirm.

After hearing the evidence, the trial court terminated Mother's parental rights, finding that Mother had (1) knowingly placed or knowingly allowed the children to remain in conditions or surroundings that endangered the children's physical or emotional well-being (subsection (b)(1)(D)), (2) engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered the children's physical or emotional well-being (subsection (b)(1)(E)), and (3) been the cause of the children's being born addicted to alcohol or a controlled substance other than a controlled substance legally obtained by prescription (subsection (b)(1)(R)); and that termination was in the children's best interest (subsection (b)(2)). *See id.* § 161.001(b)(1)(D), (E), (R), (b)(2).

The trial court also terminated Father's parental rights, making two of the same grounds findings (subsections (b)(1)(D) and (E)), but instead of a subsection (b)(1)(R) finding, the trial court found that Father had constructively abandoned the children (subsection (b)(1)(N)); the trial court also found that termination of Father's parental

---

[1]To protect the parties' privacy in this case, we identify the children and other relatives by fictitious names and their mother and the appealing father simply as Mother and Father. *See* Tex. Fam. Code Ann. § 109.002(d).

rights was in the children's best interest (subsection (b)(2)). *See id.* § 161.001(b)(1)(D), (E), (N), (b)(2).

On appeal, emphasizing that at one point the Texas Department of Family and Protective Services had planned to place the children with her in a monitored return, *see id.* § 263.403(a) ("Monitored Return of Child to Parent"), Mother contends that the evidence is legally and factually insufficient to support the trial court's best-interest finding. As part of her sufficiency complaint, she also argues that public policy prohibits terminating her rights when a safe relative placement is possible, and in her case, she had proposed placing the children with either a paternal grandmother or with her cousin.

Father too contends that the evidence is legally and factually insufficient to support the trial court's finding that terminating his parental rights was in the children's best interest and points to his diligence in working his service plan. Like Mother, Father contends that the trial court should have placed the children with his mother or with Mother's cousin rather than terminate his parental rights.

### Preliminary Matters

This case involves numerous children and several fathers. Not all the children and not all the fathers are parties to this appeal, but they are part of the testimony's overall evidentiary framework.

Mother has seven children—Alfred, Betty, Conner, Danielle, Edward, Frances, and Ginette.

3

Mother's first four children are not the subject of this suit: Alfred, Betty, and Conner live with one of Mother's aunts, while Danielle lives with her father. But the trial court terminated Mother's parental rights to her last three children—Edward, Frances, and Ginette—and Mother has appealed the judgment as to all three.

The trial court terminated Edward's father's parental rights, but Edward's father has not appealed.

Finally, the trial court terminated the parental rights of Frances and Ginette's father (Father), and he has appealed the decision as to those two children.

At the time of trial in August 2018, Edward and Frances were three and two years old, respectively; Ginette, the youngest, was only a year old. Mother was 27 years old, and Father was 30.

For further context, the trial court was approaching what one trial-court judge has referred to as the "drop-dead dismissal date." *See In re C.D.S.-C.*, No. 02-12-00484-CV, 2013 WL 1830398, at *14 (Tex. App.—Fort Worth May 2, 2013, no pet.) (mem. op.). That is, because the trial court had already granted the one allotted dismissal-date extension, the family code prohibited it from further extending the deadline. *See* Tex. Fam. Code Ann. § 263.401(c).[2] At the time of trial in August, then,

---

[2]The Department filed its original petition on March 6, 2017, which made the dismissal date March 12, 2018. *See* Tex. Fam. Code Ann. § 263.401(a). The trial court later extended the dismissal date to September 7, 2018. *See id.* § 263.401(b). The case was tried before the court on August 7, 2018.

4

the trial court was threatened with losing jurisdiction over the case in roughly a month. *See id.*

**Evidence**

**A. The removals came in two steps.**

At the time of trial, Department investigator Latrecia Woods had a specialized assignment in the drug-impact unit. Woods responded to a referral in early March 2017 because Mother, who was both pregnant and positive for amphetamine,[3] was in an emergency room being treated for cervical pain after chasing Father during an argument.

Upon checking Mother's CPS history, Woods discovered that it was extensive. Mother had six children at the time, only two of whom (Edward and Frances) were in her care. Because of Mother's drug use, her other four children were living with relatives. According to Woods, the concerns this time were the same as when Mother had interacted with the Department before: domestic violence and drugs.

When Woods interviewed Mother, Mother admitted being upset with Father and chasing him around a car but denied that the argument became physical. Mother also admitted using methamphetamine, and although she could not provide an exact date, she indicated that she used it about every other month. And Mother admitted

---

[3]Amphetamine is a metabolite of methamphetamine, which Mother admitted using. *See Halloran v. State*, No. 09-16-00187-CR, 2018 WL 651223, at *1 (Tex. App.—Beaumont Jan. 31, 2018, no pet.) (mem. op., not designated for publication).

knowing she was pregnant when she last used. Although Woods discussed with Mother how drugs could impact her unborn child, Mother not only dismissed Woods's concerns but also acknowledged not receiving any prenatal care during her current pregnancy.

During the interview, Woods wanted to know the whereabouts of Edward and Frances. Mother told Woods that they were with her friends Billy and Delana Smith. So Woods later went to the Smiths' home and, once there, determined it was not safe. In addition to Edward, Frances, and the Smiths, Woods found seven other children, a grandchild of the Smiths, and the grandchild's mother. Woods discovered that the home was severely infested with bed bugs, and she concluded that no one there was watching the children. For example, Woods saw Frances put a penny in her mouth, but no one noticed. Because Frances was only one or two years old at the time, Woods feared that Frances could have choked. Woods then contacted Mother to see if there was anywhere else the children could stay, but Mother had no suggestions.

Mother could not even give Woods her own address. Mother explained that she and Father had been staying at different motels and—when the argument occurred—at a friend's house, but after that incident they were no longer welcomed there. When Woods asked for the friend's name and address, Mother could provide only a first name and no address.

The Department removed Edward and Frances and succeeded in having the court appoint it as the children's temporary managing conservator. Absent a viable relative placement, the children went into foster care.

Although Woods tried to get Mother to seek drug treatment, Woods testified that Mother continued to use methamphetamine until giving birth to Ginette later that same month—the meconium tested positive for amphetamine, a metabolite of methamphetamine. Father appeared at the hospital for Ginette's birth, so Woods had him drug tested as well. Despite Father's claim that he would test positive only for marijuana, he tested positive for both methamphetamine and amphetamine.

Father wanted to place the children with his mother, but his mother lived in a small, one-bedroom apartment in Waco and wanted only Ginette. Because Mother did not want the children split up, the Department did not consider Father's mother for placement. Whether Father's mother would be sufficiently protective also concerned Woods; Woods seemed to suggest that despite Father's mother's knowing about her son's past drug issues and his current situation, which included being around Edward and Frances, she did nothing. Father had no other placement options to propose.

Shortly after Ginette's birth, the trial court appointed the Department as her temporary managing conservator. By May, the Department had successfully placed all three siblings in the same foster home.

## B. Mother had a pattern of using drugs, getting clean, and relapsing.

Mother testified that she started drinking alcohol when she was 13 years old, smoking marijuana when she was 14, and using methamphetamine, Xanax, and Ecstasy when she was 17. Also by age 17, she had had her first two children and her first CPS case due to her drug use. While that case was in progress, she had her third child, Conner, and the Department removed that child too.

Sent to an outpatient program, Mother failed to complete it, claiming at the trial of this case that it was because she could not get rides. Ultimately, Mother signed over her rights to the three children to her aunt, "gave up [her] sobriety," and started using methamphetamine, Xanax, and marijuana again. This was in 2009.

Mother then went to Mexico to live with her ex-husband, during which time she allegedly stayed clean for six to seven months. But when she returned to the United States in 2011, she met Joseph, started back on drugs, and in December 2012 had her fourth child, Danielle.

Mother also had another CPS case filed. Danielle was placed with Joseph's brother; Mother's parental rights remained intact. Danielle is now living with Joseph, her father.

Mother testified that after 2012 she would have drug-free stretches of three or four months. She maintained that neither Edward (born in 2014) nor Frances (born in 2016) tested positive for drugs at their births. Ginette, however, was positive for methamphetamine at birth, and Mother took responsibility for that.

Months after the removals, in September 2017, Mother's life took a negative turn when she was indicted for using a vehicle without authorization, an offense that allegedly occurred in late July 2017.

But not every turn was for the worse. In November 2017, Mother successfully completed the 30-day Nexus Recovery Center drug-treatment program. And that same month, because she was working her services, the trial court extended the dismissal date. In January 2018, after Mother pleaded guilty to the unauthorized-use-of-a-vehicle charge, a criminal district court placed her on deferred-adjudication community supervision.

But later that month, on two separate specimen-collection dates two weeks apart, Mother tested positive for amphetamine and methamphetamine. Mother admitted at trial that ten months after the Department had removed her children, she was still using methamphetamine. Noting that Nexus was just a 30-day program, Mother also testified that she did not think it was long enough to be effective.

Rather than revoke her probation and send her to state jail, the criminal district court gave Mother the chance to go to the Concho Valley probation treatment facility. Mother acknowledged that if she left the facility early, she would go back to jail and be charged with absconding, which, she said, would lead to a two-to-five-year sentence.

Mother said that unlike Nexus her current program would last from six months to two years. At the time of trial, she had already been at Concho Valley for three to

four months, and how long she stayed there depended on her behavior; she said that she was currently at Phase 5 and that "[y]ou discharge from there on Phase 6." Her best-case projected discharge date was October 19—more than two months after the August 2018 termination trial.

In the seven months since January, Mother thought she had made the necessary changes. She wanted the judge to return her children to her because she was learning how to control her drug addiction. Mother admitted that since her February arrest, she had not seen the children.

While she awaited her release from Concho Valley, Mother wanted her children to be placed with her cousin, Helga. She also agreed with placing the children with Father's mother but was unaware that Father's mother was willing to take only one child. Mother wanted the children to be with family at least until she had a chance to (potentially) get out of care in October.

## C. Father had a history of drug use and criminal activity.

Father admitted having had an addiction to methamphetamine, but he denied having one at the time of trial. He explained that he had gone through a six- to nine-month program and had been successfully discharged with multiple certificates. Relapsing, he asserted, was not a possibility for him.

Father further admitted that he used drugs every day after the Department had removed his children until he was "locked up" in late July 2017. But Father

maintained that he was capable of sobriety, asserting that he had once remained sober for four years, from 2011 to 2014.

Father's criminal history was another potential concern—he had numerous convictions:

- Four convictions on August 22, 2017 for

    - a third-degree felony theft committed in July 2017;

    - a third-degree felony possession of methamphetamine committed in November 2016;

    - a third-degree felony evading arrest or detention with a previous conviction also committed in November 2016; and

    - a third-degree felony debit-card abuse committed in September 2016;

- A November 16, 2015 state-jail felony conviction for possession of methamphetamine committed in May 2015;

- A September 18, 2014 Class A misdemeanor conviction for burglary of a vehicle committed in August 2014;

- An April 9, 2014 Class B misdemeanor conviction for possession of marijuana committed in January 2014; and

- An April 7, 2014 state-jail felony conviction for possession of methamphetamine committed in December 2013.

Father's July 28, 2017 incarceration had impacted how frequently he saw his children; he estimated that the last time would have been earlier that same month— over a year before the termination trial.

Nonetheless, Father spoke enthusiastically about his then-present situation and future prospects:

11

> Actually, right now, I'm . . . in a halfway house. I've just been released from prison. Well, actually, from a program. Right now I'm actually at a—I'm at the ABODE Treatment center here in White Settlement, Texas. I—I start next week. I have to do a 10-day orientation before I'm actually released. Today I actually had . . . a special pass for this court hearing. So after next week, I actually start my job.

And once the halfway house released him, Father's support-system plans consisted of keeping in touch with his sponsor and with the church chaplain. Father hoped that the halfway house would release him within the next 60 days.

Acknowledging his inability to take his children immediately, Father wanted the Department to evaluate his mother or Helga as placements.

The Department did conduct a home study on his mother; according to Father, when the study faulted her home for being too small, she moved into a bigger house. Father did not know why his mother's home study was denied but acknowledged hearing about a problem with his mother's fiancé's assault-charge history. Asserting that the charge against his mother's fiancé had been dismissed, Father saw no reason for the Department to deny his mother's home study on account of the fiancé. Father also admitted that his mother had a CPS history from Waco in 1992, but he claimed that she "actually won us back." He was in foster care "[j]ust for a year."

## D. The caseworker recommended terminating Mother's and Father's parental rights.

### 1. The caseworker was not persuaded that Father was addiction-free.

Based on her experience, Sonya Dyson, the caseworker, did not think that Father had addressed the concerns that she identified to him when they spoke during

the case. Father's flatly ruling out relapsing as a possibility ran counter to Dyson's training and experience, and she thought that Father's sobriety, which occurred only within a highly structured prison environment, was not a true test of his ability to remain sober once he was released:

> Q. [By the Department] So based on your training and experience, does it concern you when someone who has only had sobriety while they have been incarcerated or in a structured facility says, ["]There's no possibility I will relapse["]?
>
> A. [Dyson] Yes.
>
> Q. And why, based solely on your training and experience, does that concern you?
>
> A. Because the true test is when they get out in the real world and they don't have somebody looking over their shoulder or telling them what to do and when to do it, and we have not seen that with him.
>
> Q. Okay. And [Father] and his attorney spent a long time talking about the extensive work that he did and the detailed relapse prevention that he planned and all the work that he has done, does any of that mean anything to you if this man still believes that he doesn't have a problem and there's no possibility he will relapse?
>
> A. No. Because we're not really concerned as much with what he's learned but the application of what he's learned. And we also know that relapse is . . . a possible reality when you're recovering.

Dyson explained that because Father took the position that relapsing was not possible, that meant that if he did relapse, he had no plan in place. She added, "I don't believe he's being very realistic. He's not planning for the future."

13

## 2. Despite Mother's progress, citing Mother's history, the caseworker thought that Mother was prone to relapsing.

Dyson's understanding was that Mother and Father were not together, but Mother had a history of returning to prior partners and relapsing.

But regardless of whether Mother returned to Father, Mother generally had a history of becoming sober and then relapsing. As an example, Dyson pointed to the one time that the Department sought to extend the case and moved for a monitored return because Mother was doing well only to see her relapse. Dyson noted that the indicators were positive then too: "Well, after [Mother] had completed the program at Nexus, I mean, she got out. She had done her drug and alcohol assessment. She was . . . attending Celebrate Recovery. She was working. I mean, she was attending visitation every week. And then shortly after, she relapsed." Dyson lamented that the Department was in the same position in August 2018 that it had been in in January 2018 when Mother had relapsed, and Dyson saw no reason why it would be different this time.

Dyson also saw no reason for the children to wait for their parents to get their lives together: "[R]ight now, they're in a stable environment and they're happy."

## 3. The Department did not approve Helga's and Father's mother's home studies.

The Department completed a home study on Helga but did not approve it. Dyson referred to an earlier hearing during which concerns about placing the children with Helga arose:

14

Based on her testimony last week, there was some concerns with her, I guess, being honest. And so we couldn't really get an accurate assessment whether or not she would be a protective caregiver, and if we placed the children there, you know, would she know her roles and responsibilities and would she abide by those.

By "last week," Dyson was referring to the July 30, 2018 hearing on Mother's motion to modify the possessory conservatorship to Helga and Helga's husband, which the trial court denied.

The Department conducted a home study on father's mother, too, but denied it. When asked why, Dyson answered, "From what I was told, it was denied due to her having previous CPS history. We didn't know the extent of that history because she did not reside in Tarrant County, and so we couldn't see that information. She didn't give details about the case." The Department was additionally concerned about Father's mother's fiancé, who lived in the home and who had an unresolved assault charge.

### 4. The caseworker articulated why termination would be in the children's best interest.

Dyson asserted that terminating Mother's and Father's parental rights was in the children's best interest and remarked, at least as to Father, that if he, Frances, and Ginette were all in the same room, she doubted that Frances and Ginette would know who he was.

The "drop-dead dismissal date"—the date by which, for better or worse, the matter had to be resolved—also appeared to concern Dyson, who said, "I mean,

15

because you have to have a measuring stick. You have to have deadlines. And unfortunately, we're near our deadline in this case." She asserted that the Department's mandate was to give children permanency, and at some point, the Department had to do just that. Dyson argued against waiting any longer: "[A]re the children just supposed to put their lives on hold while the parents are trying to . . . get to that [safe and stable] place?" And: "[W]hat happens if they don't get to that place?" She added, "[W]e've heard [this] before, they don't really have a relapse plan other than I just know I'm not [going to] relapse. And that's just not very realistic. And so in the future, if [they] do relapse, what is [going to] happen to those children and where are they [going to] go?"

In contrast, Dyson characterized the foster parents as adoption-motivated, and she saw nothing suggesting that they could not provide a stable, safe, and loving environment for the children. "I think," she said, "this is the first time the children have had stability."

But if other family members stepped up, Dyson said that the Department would consider them.

**Standard of Review**

**A. Generally**

In a termination case, the State seeks not just to limit parental rights but to erase them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except the child's right to inherit.

16

Tex. Fam. Code Ann. § 161.206(b); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). Consequently, "[w]hen the State seeks to sever permanently the relationship between a parent and a child, it must first observe fundamentally fair procedures." *In re E.R.*, 385 S.W.3d 552, 554 (Tex. 2012) (citing *Santosky v. Kramer*, 455 U.S. 745, 747–48, 102 S. Ct. 1388, 1391–92 (1982)).

Termination decisions must be supported by clear and convincing evidence. *See* Tex. Fam. Code Ann. § 161.001(b), § 161.206(a); *In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012). Due process demands this heightened standard because "[a] parental rights termination proceeding encumbers a value 'far more precious than any property right.'" *E.R.*, 385 S.W.3d at 555 (quoting *Santosky*, 455 U.S. at 758–59, 102 S. Ct. at 1397). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007; *E.N.C.*, 384 S.W.3d at 802.

For a trial court to terminate a parent–child relationship, the party seeking termination must establish, by clear and convincing evidence, two things: (1) the parent's actions satisfy just one of the many grounds listed in family code § 161.001(b)(1), and (2) termination is in the child's best interest under § 161.001(b)(2). Tex. Fam. Code Ann. § 161.001(b)(1), (2); *E.N.C.*, 384 S.W.3d at 803; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Both elements must be established; that is, termination may not be based solely on the child's best interest as determined by the

17

factfinder. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re C.D.E.*, 391 S.W.3d 287, 295 (Tex. App.—Fort Worth 2012, no pet.).

## B. Best Interest

We acknowledge the strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). To determine the child's best interest, we review the entire record. *In re E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013). The same evidence used to show a subsection (1) ground may be probative when determining best interest under subsection (2). *Id.* at 249; *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). Nonexclusive factors that the factfinder may use when determining the child's best interest include

- the child's desires;

- the child's emotional and physical needs now and in the future;

- the emotional and physical danger to the child now and in the future;

- the parental abilities of the individuals seeking custody;

- the programs available to assist these individuals to promote the child's best interest;

- the plans for the child by these individuals or by the agency seeking custody;

- the stability of the home or proposed placement;

- the parent's acts or omissions that may indicate that the existing parent-child relationship is not a proper one; and

- any excuse for the parent's acts or omissions.

18

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *see E.C.R.*, 402 S.W.3d at 249 (stating that in reviewing a best-interest finding, "we consider, among other evidence, the *Holley* factors" (footnote omitted)); *E.N.C.*, 384 S.W.3d at 807. These factors are not exhaustive, and some of them may not apply to some cases. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one of these factors may suffice in a particular case to support a finding that termination is in the child's best interest. *See id.* On the other hand, in some cases, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

### C. Legal Sufficiency

In evaluating the evidence for legal sufficiency in parental-termination cases, we determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the Department proved both the particular ground for termination and that termination is in the child's best interest. *In re J.F.C.*, 96 S.W.3d 256, 265–66 (Tex. 2002); *see In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We review all the evidence in the light most favorable to the finding and judgment, and we resolve any disputed facts in favor of the finding if a reasonable factfinder could have done so. *J.F.C.*, 96 S.W.3d at 266. We also must disregard all evidence that a reasonable factfinder could have disbelieved, in addition to considering undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to termination if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *See id.* In doing our job, we cannot

weigh witness-credibility issues that depend on the witness's appearance and demeanor because that is the factfinder's province. *J.P.B.*, 180 S.W.3d at 573. And even when credibility issues appear in the appellate record, we defer to the factfinder's determinations so long as they are not unreasonable. *Id.*

### D. Factual Sufficiency

We must perform "an exacting review of the entire record" in determining whether the evidence is factually sufficient to support terminating a parent–child relationship. *In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014). In reviewing the evidence for factual sufficiency, we give due deference to the factfinder's findings and do not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the parent violated an alleged ground and that termination was in the child's best interest. Tex. Fam. Code Ann. § 161.001(b); *see C.H.*, 89 S.W.3d at 25. If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

### E. Factual Determinations

In a bench trial, the trial court acts as the factfinder, and we give its factual findings the same weight as a jury's verdict. *Advance Tire & Wheels, LLC v. Enshikar*, 527 S.W.3d 476, 480 (Tex. App.—Houston [1st Dist.] 2017, no pet.); *In re A.E.A.*,

406 S.W.3d 404, 414 (Tex. App.—Fort Worth 2013, no pet.). The trial court evaluates and resolves any evidentiary inconsistencies. *In re S.J.R.-Z*, 537 S.W.3d 677, 691 (Tex. App.—San Antonio 2017, pet. denied); *Advance Tire*, 527 S.W.3d at 480. It alone judges witnesses' credibility. *Advance Tire*, 527 S.W.3d at 480; *In re E.R.C.*, 496 S.W.3d 270, 284 (Tex. App.—Texarkana 2016, pet. denied). The trial court may accept all, reject all, or accept only parts—rejecting other parts—of a witness's testimony, based on the record before it. *Advance Tire*, 527 S.W.3d at 480. If the evidence is subject to reasonable disagreement, we will not reverse. *Id.*

## Discussion

### A. We reject Mother's public-policy argument.

As a component of her sufficiency challenges, Mother argues that public policy militates against terminating parental rights when safe relative placements are available, but she cites no authority supporting that proposition. That alone is one basis for rejecting Mother's public-policy argument. *See In re J.D.*, No. 02-18-00255-CV, 2019 WL 150292, at *3 (Tex. App.—Fort Worth Jan. 10, 2019, no pet. h.) (mem. op.) ("Father cites no direct authority for his public-policy argument that placing a child with a family member should insulate a parent from losing his parental rights. . . . We therefore reject Father's argument."); *In re D.O.*, 338 S.W.3d 29, 38 (Tex. App.—Eastland 2011, no pet.) (rejecting parent's assertion that the state policy was to seek a relative placement over termination and over naming the Department as managing conservator).

21

Another basis to reject Mother's argument is that the caselaw refutes it: "The determination of where a child will be placed is a factor in evaluating the child's best interest, but it is not a bar to termination that placement plans are not final or that placement will be with nonrelatives." *In re C.C.*, No. 02-04-00206-CV, 2005 WL 1244672, at *7 (Tex. App.—Fort Worth May 26, 2005, no pet.) (mem. op.) (citing *C.H.*, 89 S.W.3d at 28). We have found no authority suggesting that the Department has either a statutory or a common-law duty to make a placement with a relative before a party's parental rights may be terminated. *See In re Y.V.*, No. 02-12-00514-CV, 2013 WL 2631431, at *5 (Tex. App.—Fort Worth June 13, 2013, no pet.) (mem. op.); *Frank R. v. Texas Dep't of Family & Protective Servs.*, No. 03-09-00436-CV, 2010 WL 1507832, at *3 (Tex. App.—Austin Apr. 13, 2010, no pet.) (mem. op.); *In re K.W.*, No. 02-09-00041-CV, 2010 WL 144394, at *10 (Tex. App.—Fort Worth Jan. 14, 2010, no pet.) (mem. op.). Even if the children had been placed with relatives, termination was still possible. *See In re E.J.*, No. 01-17-00548-CV, 2018 WL 285158, at *6 (Tex. App.—Houston [1st Dist.] Jan. 4, 2018, pet. denied) (mem. op.) ("The caseworker testified that the Department planned for [the child] to be adopted by his relative caregivers. The trial court properly could have considered that termination of the mother's parental rights would be a necessary precondition to achieving the goal of a relative adoption.").

The State has a compelling interest in preserving and promoting a child's welfare, and although this interest favors preserving rather than severing familial

22

bonds, when clear and convincing proof shows that preserving familial bonds is not in the child's best interest, preserving familial bonds is not mandated. *Rodarte v. Cox*, 828 S.W.2d 65, 79 (Tex. App.—Tyler 1991, writ denied).

**B. The trial court did not have to give any significant weight to Mother's and Father's proposed relative placements.**

Next, in a related argument, both Mother and Father criticize the terminations because they both proffered relative placements, but the record shows that the Department conducted home studies on Father's mother and on Helga and denied them both. Mother and Father effectively argue that the Department was wrong to reject the home studies and that the trial court was wrong to terminate when relative placements were possible.

Yet nothing in the record suggests that the Department or the trial court acted arbitrarily. Challenging the Department's denying Helga's home study, Mother filed a motion to modify possessory conservatorship to Helga. Just eight days before trial, the trial court heard and denied that motion. Something about placing the children with Helga concerned the Department, and after a contested hearing, the trial court sided with the Department. And as for Father's mother, Father did not dispute that she had a CPS history or that his mother's fiancé had an assault charge; rather, both Father and Mother dispute how the Department and the trial court should have weighed those concerns.

Another factor when considering relative placements is delay—a factor that Mother and Father ignore. We note that after the Department removes children, at the 14-day, full adversarial hearing the rules encourage relative placements:

> The court shall place a child removed from the child's custodial parent with the child's noncustodial parent or with a relative of the child if placement with the noncustodial parent is inappropriate, unless placement with the noncustodial parent or a relative is not in the best interest of the child.

Tex. Fam. Code Ann. § 262.201(n). But when this case started, Mother had no one available, and Father's mother wanted to take in only Ginette. Because Mother did not want the children separated and, primarily, because the Department had reservations about placing the children with Father's mother, the relative placement with her proved unworkable from the start, so the children were instead placed into foster care.

After that, in April 2018—more than a year after the Department had removed the children—Mother asked to have a home study on Helga performed. And still later, in May 2018, Father asked for a home study on his mother. Because the children had been in a stable, adoption-motivated foster home for such a long period of time, a relative placement could have actually destabilized their lives. Why parents would prefer a relative placement is self-evident, but determining best interest focuses on the child, not the parent. *In re B.C.S.*, 479 S.W.3d 918, 927 (Tex. App.—El Paso 2015, no pet.); *see In re C.M.*, No. 02-17-00381-CV, 2018 WL 2123472, at *5 (Tex. App.—Fort

Worth May 9, 2018, no pet.) (mem. op.) (citing *Dupree v. Tex. Dep't of Protective & Regulatory Servs.*, 907 S.W.2d 81, 86 (Tex. App.—Dallas 1995, no writ)).

Here, the proposed relative placements were not even necessarily permanent ones. Both Mother and Father advocated for temporary relative placements until they themselves had resolved their legal troubles. But stability and permanence are paramount for children. *See In re Z.C.*, 280 S.W.3d 470, 476 (Tex. App.—Fort Worth 2009, pet. denied).

## C. Mother's and Father's progress was commendable, but the question remained whether it was durable.

Mother and Father both emphasize their progress. No one disputed at trial that Mother and Father had been clean for a time—Mother while at Concho Valley and Father while incarcerated and while at the halfway house. And although both professed the ability and desire to stay clean after their release, the trial court could have given their testimony little weight in view of other testimony that relapses were possible and, more specifically, that both Mother and Father had relapsed in the past. *See Advance Tire*, 527 S.W.3d at 480. Although we commend Mother and Father on their progress and encourage them on that path regardless of this case's outcome, the trial court was not required to believe that they would not relapse. *See De Llano v. Moran*, 333 S.W.2d 359, 361 (Tex. 1960); *In re V.S.*, No. 02-18-00195-CV, 2018 WL 6219441, at *11 (Tex. App.—Fort Worth Nov. 29, 2018, no pet. h.) (mem. op.).

25

Despite Mother's and Father's admirable strides toward turning their lives around, the trial court could reasonably question their ability to continue to do so. Moreover, given that the parents' complained-of conduct continued well after the removals and given the vulnerability of all three children due to their extreme youth, the trial court could reasonably fear the consequences to the children if their parents encountered difficulties, especially when, as here, the parents' support group of relatives itself raised safety concerns.

**D. The evidence supports terminating Mother's and Father's parental rights.**

Overall, clear and convincing evidence supported terminating Mother's and Father's parental rights. Both had a history of using drugs and relapsing. Both had criminal histories that, even at the time of trial, adversely impacted their ability to parent. *See Holley*, 544 S.W.2d at 371–72. Both parents hoped—but could not guarantee—that they would be free to parent the children two months after the trial. And although both assured the court that they would not relapse, uncertainty dogged them.

Conversely, while the case was pending, the children had found a stable placement that, because the foster parents were adoption-oriented, also offered the children continuity, safety, and permanence. *See id.*

**E. We overrule Mother's and Father's legal- and factual-sufficiency challenges.**

Viewing the evidence in the light most favorable to the verdict, we hold that a factfinder could reasonably form a firm belief or conviction that terminating Mother's and Father's parental rights was in the children's best interests and that the evidence is therefore legally sufficient to support the best-interest findings. *See J.P.B.*, 180 S.W.3d at 573; *see also* Tex. Fam. Code Ann. § 161.001(b)(2).

And based on the entire record and giving due deference to the factfinder's findings, we also hold that a factfinder could reasonably form a firm conviction or belief that terminating Mother's and Father's parental rights was in the children's best interest and that the evidence is thus also factually sufficient to support the best-interest findings. *See H.R.M.*, 209 S.W.3d at 108; *C.H.*, 89 S.W.3d at 28; *see also* Tex. Fam. Code Ann. § 161.001(b)(2).

We overrule Mother's and Father's legal- and factual-sufficiency challenges.

**Conclusion**

Having overruled Mother's and Father's contentions, we affirm the trial court's judgment.

/s/ Elizabeth Kerr
Elizabeth Kerr
Justice

Delivered:  February 7, 2019